[No. 11184.   In Bank. — May 1, 1886.]

# E. R. THOMASON, APPELLANT, v. C. S. RUGGLES, SUPERINTENDENT OF PUBLIC STREETS, ETC., RESPONDENT.

STREET WORK — SAN FRANCISCO — CERTAIN ACTS CONSTRUED — CONSTITUTIONAL LAW. — The application was for a writ of mandate to compel the defendant, as superintendent of streets of the city and county of San Francisco, to enter into and execute a certain contract for curbing and paving a portion of a street in the city and county, and constructing sidewalks thereon. The proceedings for the work were taken under the act of April 1, 1872, amending the charter of the city and county. At the time the demand was made on the superintendent to execute the contract, no assessment had been levied or collected for the proposed work, as required by section 19 of article 11 of the constitution of 1879. *Held by Myrick, J., Ross, J., and Morrison, C. J.,* that the act of April 1, 1872, so far as it authorized the doing of street work without a previous levy and collection of an assessment, was repealed by section 19 of article 11 of the constitution, and was not revived by the amendment of November 4, 1884, dispensing with the necessity of such previous levy and collection of the assessment; that the amendment was constitutionally adopted, and that the act of March 18, 1885, providing for street work in municipalities, and repealing the act of March 6, 1883, was a general law within the meaning of the constitution, and was in force in the city and county of San Francisco.

ID. — *Held by McKee, J.,* that the act of April 1, 1872, was repealed by section 19 of article 11 of the constitution; that the amendment of 1884 was not constitutionally adopted, because it had not been entered at large on the journals of the legislature, and that consequently the act of March 18, 1885, was invalid, and that the act of March 6, 1883, was in force in the municipalities of the state.

ID. — *Held by McKinstry, J., and Sharpstein, J.,* that the act of April 1, 1872, was not repealed by the constitution; that the act of March 18, 1885, was not a general law within the meaning of section 6 of article 11 of the constitution, and that the judgment should be affirmed for insufficiency in the petition.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco.

The facts are stated in the head-notes and opinions.

*C. H. Parker, J. M. Wood,* and *John F. Swift,* for Appellant.

*John L. Love,* for Respondent.

*Henry E. Highton, amicus curiæ.*

MYRICK, J.—On the 1st of April, 1872, the legislature passed a law relating to street improvements in the city and county of San Francisco. This act, from section 4 to section 13 inclusive, provided a general plan of street work by contract, such contract to be entered into and the work peformed *before* the collection of the money. This act was a portion of the charter of the city and county, and was in force until the constitution went into effect, January 1, 1880. That constitution contained the following clause, viz.:—

"No public work or improvement of any description whatsoever shall be done or made in any city, in, upon, or about the streets thereof, or otherwise, the cost and expense of which is made chargeable or may be assessed upon private property by special assessment, unless an estimate of such cost and expense shall be made, and an assessment in proportion to benefits, on the property to be affected or benefited, shall be levied, collected, and paid into the city treasury before such work or improvement shall be commenced, or any contract for letting or doing the same authorized or performed." (Art. 11, sec. 19.)

It will thus be seen that after January 1, 1880, no public work or improvement chargeable upon private property by special assessment could be done, or contract therefor made, *until* an assessment had been levied, and the amount of the cost and expense had been collected and paid into the treasury. This provision of the constitution seems to have stricken deeper than merely prohibiting the doing of work; it declared that until the collection of the money, no contract for doing the work could be let. As the entire system provided for by the sections of the act referred to (4 to 13 inclusive) seems to have reference to the letting of contracts before assessments and collections, did not the entire system fall together, as well that portion which provided for resolutions and declarations of intention, as those portions which were in direct antagonism?

The constitution contains the following clause:—

"The provisions of all laws which are inconsistent with this constitution shall cease upon the adoption thereof." (Art. 22, sec. 1.) The effect of this clause upon the act of April 1, 1872, is one of the questions presented to us, it being claimed on one side that it in effect repealed the act, and on the other, that the operation of the act was merely suspended until the constitutional amendment hereinafter referred to. We shall consider this question further on.

There being no law in existence for the performance of work according to the clause of article 11, section 19, above quoted, the legislature passed an act, March 6, 1883, for the levying of assessments, collecting moneys, and making of contracts for street work in compliance with that clause. On the 4th of November, 1884, by a vote of the people, the constitution was amended by striking out the said clause, thus leaving no constitutional restriction as to performing work before the collection of the money, and leaving it to the legislature to pass such laws in that regard as it might deem expedient, subject only to such prohibitions as may exist regarding the application of such laws to existing charters. This amendment did not affect the act of March 6, 1883, because, when that act was passed, the general plan thereby adopted was in compliance with the constitution as it then existed; and the subsequent amendment, by removing the prohibition, left the legislative will free to act.

On the 18th of March, 1885, the legislature passed an act to provide for work upon streets, lanes, etc. This act in terms repealed the act of March 6, 1883, and provided a system similar in many respects to the act of April 1, 1872. The general system of making contracts before the collection of the money seems to have been provided for in this act; whatever variations in detail there may be is not necessary to consider in this case.

It is objected that the amendment to the constitution was not constitutionally adopted, and therefore the clause above quoted from article 11, section 19, is still in force, and therefore the act of March 18, 1885, is in its general features unconstitutional; and so far as it attempted to repeal the act of March 6, 1883, it is unconstitutional, because that object was not expressed in its title. The ground upon which it is claimed that the amendment to the constitution was not properly adopted is this:—

Article 18, section 1, of the constitution, relating to amendments thereof proposed in the senate or assembly, declares that such proposed amendment or amendments shall be entered in the journals of both houses, with the yeas and nays taken thereon. When this amendment was proposed, it was not entered at length (that is, written out in full) in the journal of each house; the entry made was by identifying reference to the title of the proposed amendment. It will thus be seen that the whole question turns on the meaning of the words "entered in the journals." Various authorities have been presented, claimed to be applicable to the one side or the other, as presented; and after considering them, and the reasons presented to us, we are of opinion that the amendment was properly passed. The former constitution, as it existed in 1862, contained a similar provision, the words "on the journals" being used instead of "in the journals." When the amendments of 1862 were proposed in the senate and assembly, they were not entered at length in the journals of both houses, but were entered on the journal of one of the houses by identifying reference to title. These amendments, being adopted by the people, made a radical change in the judicial system of the state,—among other changes directing that the Supreme Court should be composed of five justices instead of three as theretofore, and enlarging the jurisdiction of the court in some respects. The

tribunal thus remodeled continued in existence as the court of last resort in this state from January 1, 1864, to January 1, 1880,—a period of sixteen years. The convention which framed the present constitution had before it the requirements of the previous constitution as to amendments, the fact that the amendments of 1862 were adopted as above stated, that the judicial system provided for by such amendments had been in operation without question for sixteen years, and with such knowledge used similar language in the instrument being framed. We are justified in saying that the people of this state have, by acquiescence and by direct act in convention assembled, placed a construction on the words employed, and we may take the course thus pursued and that pursued in other instances of similar import as authority in this state, that when a proposed amendment is entered in the journal of either house by identifying reference it is within the meaning and intent of the constitution. entered in the journal of that house.

In *McDonald* v. *Patterson*, 54 Cal. 245, this court (in Department Two) had occasion to consider the effect of section 19, article 11, of the constitution, on the act of April 1, 1872; and it was there held that upon the adoption of the constitution the act ceased to be operative. It was not necessary, in that case, to consider the effect of section 1, article 22. It is now contended that as the prohibitory clause of section 19, article 11, has been stricken out by the amendment of 1884, the act of April 1, 1872, has ceased to be inoperative, and is revived, and is now in force. Section 1, article 22, reads: "The provisions of all laws which are inconsistent with this constitution shall cease upon the adoption thereof." The act of 1872 was inconsistent with the constitution, because it (the act) provided for a system of letting contracts and performing work before collections, and the constitution declared that such thing should not be done. The act therefore

(so far as it related to this subject) ceased. It is usual for legislative bodies to use the word "repealed"; and when used, the act referred to is abrogated,—done away with. To cease is to put a stop to; to be done away with; to be an extinction. (Webs. Dic.) When, therefore, the constitution declared, as in effect it did declare, that the act of 1872 should cease, it did away with it—it extinguished it—as thoroughly as would be the legislative repeal of a prior act; and the subsequent amendment of the constitution did not revive the extinct act any more than would the repeal of a repealing act revive the act repealed.

Thus, then, it will be seen, the city and county of San Francisco has a charter which contains no system of street work where the cost is chargeable upon private property by special assessment. In that view it is contended that there is and can be no law for the performance of such street work until by vote of the people of the city and county a new charter be adopted or the old one amended in that regard.

It is urged that the language of section 6, article 11, of the constitution,—"Corporations for municipal purposes shall not be created by special laws; but the legislature, by general laws, shall provide for the incorporation, organization, and classification, in proportion to population, of cities and towns,"—refers solely to organization as such; and that when the corporation is once launched and has an existence, either under the general law or under a prior existing special law, the legislature may by general laws control the corporation in all matters not affecting its actual existence as a body.

In arriving at a proper conclusion in this case, we labor under the great difficulty of endeavoring to harmonize apparently conflicting provisions of the constitution. One idea seems to be prominent in that instrument: that is, local government for local purposes. Yet we find such provisions as the following: "Cities or towns

heretofore or hereafter organized, and all charters thereof framed or adopted by authority of this constitution, shall be subject to and controlled by general laws." "Cities and towns heretofore organized or incorporated may become organized under such general laws"; a charter when adopted under the fifteen-freeholder clause shall "be submitted to the legislature for its approval or rejection as a whole."

It would be a very difficult matter to determine how far a prior existing charter may remain intact in all its provisions and yet be "subject to and controlled by general laws." To illustrate: Suppose a general law were passed that the presiding officer and executive of every municipality in the state should be called the president of the corporation; would the mayor of the city and county of San Francisco cease to have that title, and be compelled to take on the title of president of the city and county of San Francisco? or could he, under the existing charter, retain his title of mayor?

It is not necessary to attempt to lay down a rule in advance of an existing case. It is sufficient to take the case now before us. There exists a charter which has no provision for the performance of a certain class of street work; a general law is passed providing a system for the performance of that class of street work; that law does not appear to conflict or interfere with any provision of the existing charter. Why, then, may it not be held to be valid, and yet leave the charter intact in all respects? To so hold is not to hold that the legislature has power over the charter as it exists; it is to hold that where the charter does not make provision, the legislature may by general law make provision. The act of 1872 has provisions not done away with by the constitution; such as for the performance of work in certain cases at the expense of the city. To hold the act of 1885 not applicable to the city and county would have the effect of saying that no street work can be done ex-

cept that which is to be paid for out of the city treasury.

All public streets, alleys, and roads in the state are public highways for the use of the people of the state. The state in its sovereign capacity has the original right to control them for the public use. The state for this purpose has the right to grade and repair. "The highways within and through a state are constructed by the state itself, which has full power to provide all proper regulations of police to govern the action of persons using them, and to make from time to time such alterations in these ways as the proper authorities shall deem proper." (Cooley's Const. Lim. *588.) This applies equally to the streets and alleys of a city or village as to country roads. A municipality has no control over a highway unless the right of control has been vested by the state in the municipality.

For convenience, this power of the state is frequently vested in the municipality; but unless so vested it remains in the state; when so vested the municipality acts as the agent of the state. It is from the state only that a municipality has power to levy an assessment on property for street work. In the absence of a delegation of such power, its efforts in that direction would be futile. When by the act of 1872 that power was delegated to the authorities of the city and county of San Francisco, the action of the authorities rested solely on that delegated authority. When the constitution of 1879 went into effect, that delegated authority was, as to the questions in this case, revoked by the people in their sovereign capacity. No authority or power in that direction existed, save while the act of 1883 was in force. In passing the act of March 18, 1885, the state, acting through its legislature, and in the exercise of its authority over streets, lanes, and alleys, delegated to the authorities of the city and county, as it had the right to do, the authority to pursue the mode therein pointed out for doing the work therein designated.

It follows from the above that the judgment and order sustaining the demurrer must be affirmed.    So ordered.

MORRISON, C. J., concurred.

McKEE, J., concurring. — In my judgment, the street law of the city and county of San Francisco (Stats. 1872, p. 804) was struck dead on the first day of January, 1880, by the provisions of section 19, article 11, of the constitution of the state, and section 1, article 22, constitution, so far as inconsistent with those provisions. (*McDonald* v. *Patterson*, 54 Cal. 248; *Donahue* v. *Graham*, 61 Cal. 276.) On that day the constitution went into effect, and by its own terms became the supreme law of the state. About three years thereafter the legislature carried out the constitutional provisions upon the subject of street improvements, in the municipalities of the state, by conferring jurisdiction upon municipalities to order such work to be done in conformity with those provisions. (Stats. 1883, p. 32.)

It is contended, however, that section 19, article 11, of the constitution, has since been amended by striking out the inhibitory clause upon the exercise of jurisdiction to order street work to be done before assessment and collection of the money necessary to pay for it, as was required by the constitution; and that now, under the constitution as amended, such work may be ordered and contracted for without the cost and expenses of the work being first ascertained and determined and collected and paid into the municipal treasury.

There is no doubt of the fact that such an amendment to the constitution was proposed at the legislative session of 1884, and that it was voted for by two thirds of the members elected to each of the two houses.    But I find the fact to be that the proposed amendment was not entered in the journals of the houses as required by section 1, article 18, of the constitution, which provides: "Section 1. Any amendment or amendments to this

constitution may be proposed in the senate or assembly, and if two thirds of all the members elected to each of the two houses shall vote in favor thereof, *such proposed amendment or amendments shall be entered in their journals, with the yeas and nays taken thereon,"* etc.

That was one of the methods which the constitution provided for its amendment; the other method provided was a constitutional convention, to be called in the manner prescribed by section 2 of the same article. The constitution is therefore constitutionally amended only by one or other of these methods; and where the first is resorted to for the purpose of amendment, the manner prescribed must be substantially complied with, else no amendment takes place, for the rule is well settled, that when power is given to do a thing in a particular way, there the affirmative words marking out the particular way prohibits all others by implication. So that the particular way is the only way in which the power can be legally exercised. (*Smith* v. *Stevens,* 10 Wall. 321; 1 Kent's Com. 467, note *d.*)

In adopting the proposed amendment of 1884, the legislature did not exercise its power in the manner prescribed by the constitution. The proposed amendment was not "entered upon the journals of both houses," as the constitution commanded. What was done in lieu of such entry was to make on the journal of the senate "identifying reference" to the proposed amendment, in the following form: "Senate bill No. 15.—Amendment to the constitution. To amend section 9 of article 13 of the constitution of the state of California." (Senate Journal of 1884, p. 114.)

Is that an entry upon the journals within the intent and meaning of the constitution? I think not.

To quote the language of Chief Justice Marshall in *Gibbons* v. *Ogden,* 9 Wheat. 188: "The framers of the constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and

to have understood what they meant"; and when they declared that a proposed amendment to the constitution must be "entered upon the journals of both houses," they meant just what the ordinary and popular signification of those terms import, and nothing less. To enter a paper upon a public journal or record is to inscribe; to enroll; to record it. (Webster's Dictionary, tit. Enter.) "Entry, as a matter of record, is the act of setting down or causing to be set down, in writing; recording or causing to be recorded, in due form." (Abbott's Law Dictionary, p. 430, tit. Entry.) Enrollment or recordation is therefore the meaning of the constitution, and that meaning is not satisfied by a mere "identifying reference."

I therefore think that the proposed amendment of 1884 was not constitutionally adopted; that it wrought no change in the constitution; and that the Vrooman statute of 1885, passed to carry out the provisions of the alleged amendment, is unconstitutional and void. Hence the only law under which street work can be ordered in the municipalities of the state is the statute of 1883, passed to carry out the provisions of the constitution as it was at the date of the passage of that statute; and upon these grounds, I think the demurrer to the petition in the proceedings in the court below was properly sustained.

THORNTON, J., concurring.—I concur in the judgment, and will hereafter give my reasons therefor.

ROSS, J., concurring.—In *Staude* v. *Election Commissioners*, 61 Cal. 320, after quoting that portion of section 6 of article 11 of the constitution which declares that "cities and towns heretofore or hereafter organized, and all charters thereof framed or adopted by authority of this constitution, shall be subject to and controlled by general laws," we said: "The framers of the instrument meant something when they inserted this language in it,

and we are not at liberty to hold that they did not mean what they said. Giving, as they did, to all cities and towns, and cities and counties, the right to organize under a general act of incorporation, which the legislature was directed to pass, or to continue their existence under their existing charters, as they might elect, they nevertheless said that whichever course should be pursued, such cities and towns, and cities and counties, should be subject to and controlled by general laws,— such general laws as shall be passed by the legislature, other than those for the 'incorporation, organization, and classification' of cities and towns. The constitution has provided, in effect, that the city and county of San Francisco shall not be compelled to surrender its present charter for one it does not want; and further, that its charter shall not be changed by special legislation, directly nor indirectly, under the guise of laws relating to cities, or cities and counties, containing a population of more than one hundred thousand inhabitants. At the same time, recognizing the fact that the city and county of San Francisco remains a subdivision of the state, the constitution has said in effect that it, as well as all other cities and towns heretofore or hereafter organized, shall be subject to and controlled by such general laws as the legislature shall enact, other than those for the incorporation, organization, and classification, in proportion to population, of cities and towns. We do not perceive the danger suggested by counsel for respondents, of the Consolidation Act being 'eaten away' by such legislation. It cannot, as already observed, be supplanted by a general act of incorporation without the will of the people expressed at the polls, nor can it be affected by special legislation; and it is not probable that such *general* laws as the legislature may enact in conflict with its provisions will seriously affect it. But be that as it may, the constitution has expressly declared that it shall be subject to and controlled by such laws."

The courts have no more power to take from than they have to add to the provisions of the constitution. As has been seen, that instrument in express terms declares that "cities or towns heretofore or hereafter organized . . . . shall be subject to and controlled by general laws." No one will deny that San Francisco is one of such cities. The provision, therefore, is that San Francisco, as well as all other cities and towns of the state "shall be subject to and controlled by general laws." In the face of this plain language, how can it be held that San Francisco is *not* subject to and controlled by general laws? To so hold would, it seems to me, be to violate the plain and unambiguous language of the organic act. Nor have the courts the power to impose a limitation by saying that such cities and towns shall only be subject to and controlled by some certain *class* or *classes* of general laws. The constitution has imposed no such limitation, and by that we must be governed. The "general laws" spoken of in the concluding clause of section 6 of article 11 do not mean the general laws the legislature is commanded to pass for the incorporation, organization, and classification, in proportion to population, of cities and towns, or amendments thereto, because it is by the constitution left optional with cities and towns in existence when the constitution was adopted to become organized under such general acts of incorporation or not, as they should elect. But this is the only limitation upon the provision that such cities and towns shall be subject to and controlled by general laws that I can find any warrant for in the constitution.

It is unnecessary here to speak of the further provision contained in section 8 of article 11, giving to any city containing a population of more than one hundred thousand inhabitants authority to frame a charter for its own government, consistent with and subject to the constitution and laws of the state, by causing a board of fifteen freeholders to be selected to prepare and propose a charter, etc.

If I am correct in my interpretation of the provisions of the constitution upon the subject, it follows that the Vrooman act of 1885 is not an act for the "incorporation, organization, and classification" of cities and towns, and *is* a "general" law, it applies to the city and county of San Francisco as well as to every other municipality of the state. A simple reading of the act in question will show clearly that it is not a general law "for the incorporation, organization, and classification, in proportion to population, of cities and towns," which the legislature is, by section 6 of article 11 of the constitution, commanded to pass. It does not purport to provide for the incorporation, organization, and classification, in proportion to population, of cities and towns. But it does provide for the doing of work upon the streets, lanes, alleys, courts, places, and sidewalks, and for the construction of sewers within all the municipalities of the state. It is therefore a general law. A more general one upon the subject could not be framed, and if the constitution means what it says when it declares that "cities or towns, heretofore or hereafter organized, and all charters thereof framed or adopted by authority of this constitution, shall be subject to and controlled by general laws," I am unable to see why this act does not apply to the city and county of San Francisco as well as to all other municipalities of the state. In my opinion, it does do so. I agree with Mr. Justice Myrick that the constitutional amendment of 1884, removing the inhibition contained in the nineteenth section of article 11 of that instrument, as adopted in 1879, was properly adopted. It was so held by a majority of this court in the recent case entitled *People* v. *Strother*, 67 Cal. 624.

For the reasons here given, I concur in the judgment.

McKINSTRY, J., and SHARPSTEIN, J., concurring.—We think the street law of 1872 is a part of the charter of the city and county of San Francisco, which was not re-

pealed or abrogated by the constitution of 1879.  Our reasons for this conclusion are fully set forth in the opinion of Mr. Justice Sharpstein in *Staude* v. *Election Commissioners*, 61 Cal. 324, and in the opinion of Mr. Justice McKinstry in *Donahue* v. *Graham*, 61 Cal. 277–282.

We also think that the act of March, 1885, is not a " general law " within the meaning of the last clause of section 6, article 11, of the constitution.

We do not deem it necessary, however, to dissent from the judgment, inasmuch as the petitioner has not prayed for a writ of mandate, and the petition avers that the law of 1872 is not in force, while the law of 1885 has not been complied with.  In the exercise of its jurisdiction to entertain or refuse the application, the court below was justified in refusing it to one who (even if he had asked for a writ) has declared in his petition that, in his own judgment, he is not entitled to it.